1   J. Gary Gwilliam, Esq. (State Bar No. 33430)
2   Robert J. Schwartz, Esq. (State Bar No. 254778)
    Jayme L. Walker, Esq. (State Bar No. 273159)
3   GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
    1999 Harrison Street, Suite 1600
4   Oakland, CA 94612-3528
    Telephone: (510) 832-5411
5   Facsimile: (510) 832-1918
    Email: ggwilliam@giccb.com; rschwartz@giccb.com
6
7   Attorneys for Plaintiff
    MONA SHING, M.D.
8

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079, Oakland, CA 94604-2079

9
10                  UNITED STATES DISTRICT COURT
11                NORTHERN DISTRICT OF CALIFORNIA
12

13  DR. MONA SHING,                          Case No.

14              Plaintiff,                    **COMPLAINT FOR DAMAGES**
                                              **1.  WHISTLEBLOWER**
15                                            **     RETALIATION**
    vs.                                       **2.  WRONGFUL TERMINATION IN**
16                                            **     VIOLATION OF PUBLIC POLICY**
    CLOVIS ONCOLOGY, INC.; ANN                **3.  DEFAMATION**
17  BOZEMAN; and DOES 1-10, inclusive,        **4.  BREACH OF CONTRACT**
                                              **5.  BREACH OF THE IMPLIED**
18              Defendants.                    **     COVENANT OF GOOD FAITH**
                                              **     AND FAIR DEALING**
19
20                                            **DEMAND FOR JURY TRIAL**
21
22
23
24
25
26
27
28

## I.   <u>INTRODUCTION</u>

1.     Plaintiff Mona Shing, M.D. ("Dr. Shing" or "Plaintiff") has over 15 years of experience in the pharmaceutical and biotechnology industry, with positions at Genentech, Inc., Amgen, Inc., and Schering AG.  In April 2017, she took a job as Senior Vice President, Global Medical Affairs with defendant Clovis Oncology, Inc. ("Clovis") in San Francisco.  She was drawn to the position because of the company's development of rucaparib, a treatment for advanced ovarian cancer and potentially other cancers, such as breast cancer and pancreatic cancer.  Throughout her career, Dr. Shing has maintained a central focus – improving the lives of her patients – which she accomplishes through new science, medicine, compassion, truth, and integrity.

2.     However, Dr. Shing soon learned that Clovis' executive leadership viewed compliance with applicable laws and regulations not as an obligation, but as an obstacle.  Thus, when Dr. Shing repeatedly reported non-compliant and unethical behavior to the Chief Medical Officer, her supervisor Lindsey Rolfe – who was also a member of the Clovis Compliance Committee tasked with ensuring compliance – Rolfe responded with callous indifference, turning a blind eye to the legal risks and danger to patients.

3.     In particular, Dr. Shing reported that the Clovis CEO, Patrick Mahaffy, provided unlawful kickbacks – including funding a non-compliant and potentially dangerous study in response to a foreign government official's threats to withdraw support from two unrelated Clovis studies.  Mahaffy unabashedly touted the non-compliant study in earnings calls, thereby grossly misleading investors.  Such misconduct was standard practice at the company.

4.     Clovis' response to Dr. Shing's compliance efforts was telling – criticize her "leader assimilation" skills based on false, subjective, and misleading allegations, in a clear attempt to force her into resigning.  Rather than protect Dr. Shing from retaliation, the company's Senior Vice President, Human Resources, defendant Ann Bozeman, became its agent, directly instructing Dr. Shing to engage in non-compliant behavior, claiming it was critical for her success at Clovis.  Moreover, before Dr. Shing knew that she was locked out of Clovis, and 6 days before her December 8, 2017, departure date, Bozeman sent an email to Dr. Shing's

1  colleagues, falsely implying that she abandoned them before a critical international meeting,

2  forcing its cancellation.

3  **II.      JURISDICTION AND VENUE**

4      5.      Pursuant to 28 U.S.C. section 1332(a)(1), the Court has original jurisdiction over

5  this action because the amount in controversy exceeds $75,000, exclusive of interest and costs,

6  and the parties are citizens of different states.

7      6.      The Court has personal jurisdiction over Clovis because, among other things, the

8  company transacts business in this District, and Clovis engaged in wrongdoing in the District.

9      7.      Pursuant to 28 U.S.C. section 1391(b)(1)-(2), venue is proper because Clovis

10  resides in the District and a substantial part of the events or omissions giving rise to the action

11  occurred in the District.

12  **III.     PARTIES**

13      8.      Plaintiff Mona Shing, M.D., received a Bachelor of Science degree in

14  Engineering from the University of California, Los Angeles in 1989, followed by a Doctor of

15  Medicine degree from Georgetown University School of Medicine in 1995.  She has a physician

16  and surgeon license from the Medical Board of California since 1997, and is board certified by

17  the American Board of Internal Medicine since 1999.  From 2000-2001, she was an Attending

18  Physician in the Department of Internal Medicine at Santa Clara Medical Center.

19      9.      In 2002, Dr. Shing began working in the pharmaceutical and biotechnology

20  industry, as a Project Clinician in Global Medical Development Oncology with Schering AG

21  (which later merged with Bayer AG), in which capacity she had responsibilities for the design,

22  development, and strategy of Phase I-III clinical drug studies.  In 2005, Dr. Shing was hired as a

23  Director in Global Clinical Development Oncology Therapeutics at Amgen, Inc., where she led

24  the strategic clinical development of panitumumab (Vectibix®), a treatment for metastatic

25  colorectal cancer.  In 2008, Dr. Shing began working for Genentech, Inc., and received multiple

26  promotions over the years to Group Medical Director, leading an international team in the

27  development of trastuzumab (Herceptin®), a treatment for breast, stomach, and gastro-

28  esophageal junction cancer.  From 2012-2014, Dr. Shing was Genentech's Senior Medical

1  Director in Global Pharma Development Oncology, working as a late-stage clinical development

2  expert for various programs.

3       10.    In April 2017, Dr. Shing began her employment with defendant Clovis Oncology,

4  Inc., as Senior Vice President, Global Medical Affairs, broadly responsible for identifying and

5  executing the medical affairs strategy necessary to develop and commercialize the company's

6  approved products.  Dr. Shing has been published over 50 times, with manuscripts in peer-

7  review medical journals and abstracts/posters in peer-reviewed international congresses.

8       11.    Defendant Clovis Oncology, Inc. is a biopharmaceutical company focused on

9  acquiring, developing, and commercializing cancer treatments in the United States, Europe, and

10  other international markets.  Clovis' development programs are targeted at specific subsets of

11  cancer, combining precision medicine with companion diagnostics to direct therapeutics to those

12  patients most likely to benefit from them.  Clovis has one marketed product, Rubraca®

13  (rucaparib) tablets.  The company's Chief Executive Officer is Patrick Mahaffy ("Mahaffy").

14  Clovis' headquarters is located in Boulder, Colorado, although the company maintains an office

15  in San Francisco, where Dr. Shing was employed.

16       12.    Clovis and its officers have repeatedly been sued for making false and misleading

17  statements regarding the company's drug development, including the efficacy of rociletinib, its

18  safety profile, the progress toward U.S. Food and Drug Administration ("FDA") approval of the

19  drug, and its potential for market success.  The largest of the rociletinib class actions settled on

20  October 26, 2017, for $167.0 million ($25.0 million in cash and issuance of $142.0 million in

21  Clovis common stock).  In addition, Clovis has been investigated and charged by government

22  agencies, including the U.S. Securities and Exchange Commission ("SEC") and the U.S.

23  Department of Justice, relating to the company's regulatory update announcement in November

24  2015 that the FDA requested additional clinical data on the efficacy and safety of rociletinib.  On

25  September 18, 2018, the SEC announced that Clovis, its CEO (Mahaffy), and its former CFO

26  were to pay more than $20 million in penalties to settle charges of misleading investors about the

27  company's developmental lung cancer drug, rociletinib.  Clovis was charged with violating

28  Section 17(a)(2) of the Securities Act of 1933 and Section 13(a) of the Securities Exchange Act

1   of 1934.  The complaint charged Mahaffy with violating Section 17(a)(2) and aiding and abetting

2   Clovis' violations of Section 13(a).

3        13.    At all times material to this complaint, defendant Ann Bozeman ("Bozeman") was

4   the Senior Vice President, Human Resources for Clovis.  In doing the actions alleged herein,

5   Bozeman was acting within the course and scope of her authority as employee and with the

6   permission and consent of Clovis.  Furthermore, Clovis employed Bozeman with a conscious

7   disregard of the rights of others and authorized and ratified her conduct alleged herein.

8        14.    Plaintiff is ignorant of the true names and capacities of the defendants sued herein

9   as Does 1-10, inclusive, and therefore sues these defendants by such fictitious names and

10  capacities.  Plaintiff is informed and believes, and on that basis alleges, that each defendant sued

11  under such fictitious names is in some manner responsible for the occurrences herein alleged,

12  and that her injuries as herein alleged were proximately caused by the conduct of such

13  defendants.

14  **IV.   FACTUAL SUMMARY**

15       15.    Plaintiff Mona Shing, M.D., began her employment with defendant Clovis

16  Oncology, Inc. on April 3, 2017, as Senior Vice President, Global Medical Affairs.  Dr. Shing

17  left a successful career with Genentech, Inc. because she was enthusiastic about Clovis'

18  development of rucaparib, a treatment for advanced ovarian cancer, with clinical potential for the

19  treatment of other solid tumors.

20       16.    As Senior Vice President, Global Medical Affairs ("GMA"), Dr. Shing was

21  responsible for leading the development of Clovis GMA's program strategy and its evolution.

22  As background, medical affairs originally emerged because of regulatory pressure for drug

23  companies to separate medical and commercial functions.  Over time, medical affairs evolved

24  into a separate medical organization primarily working on post-drug approval activities, with

25  scientific and clinical expertise to support commercial products.  Dr. Shing reported to Lindsey

26  Rolfe ("Rolfe"), Clovis' Executive Vice President and Chief Medical Officer, and a member of

27  the Clovis Compliance Committee.

28  ///

17.     At Clovis, Dr. Shing supported GMA research programming across the continuum of drug development: investigator-initiated trials ("IIT"), cooperative group and collaborator research, and company-sponsored GMA trials.  In particular, Dr. Shing inherited the Rucaparib Global IIT program and became responsible for the Global IIT program.  Amongst the Rucaparib IIT program of greater than 20 clinical trials, there was an IIT called the STRAT-STAMPEDE study, which was of significant concern to Clovis and Dr. Shing because it had the largest cost commitments and longest timelines (payments of more than $1 million/year without a specified end date, written in a non-compliant letter from Clovis to a STRAT-STAMPEDE study member in June 2016), and all without a clear scientific and medical question that would be achievable due to the evolving standard of care for prostate cancer.

18.     Per Clovis' job description for the Senior Vice President, Global Medical Affairs position, ensuring compliance with applicable laws and regulations was a key component of the job.  Thus, among Dr. Shing's responsibilities were: "Drive unwavering compliant work practices" and "Establish and maintain a compliant, supportive partnership with the Commercial organization and serve as its medical content expert."

19.     Dr. Shing took her compliance responsibilities seriously, as she had throughout her career.  However, she soon learned that Clovis had serious compliance issues, the likes of which she had never experienced in her more than 15 years in the pharmaceutical and biotechnology industry.  However, when Dr. Shing brought these non-compliant practices to the attention of Clovis' executive leaders, the company chose to retaliate, rather than address the serious problems.

20.     Indeed, on her very first day, Dr. Shing received an email from one of her subordinates, the National Medical Science Liaison ("MSL") Director, where he expressed fear of retaliation by Clovis' CEO, Patrick Mahaffy, for reporting negative feedback from a U.S. physician based in Colorado, who was a potential prescriber of Clovis' drug, rucaparib.  Shortly thereafter, Mahaffy committed to funding a forum in Dubai, United Arab Emirates, co-chaired by this Colorado physician.  Dr. Shing would later learn that Mahaffy's unlawful kickback to this Colorado physician was being processed via the GMA educational program in a non-compliant

manner.

21.     On April 12, 2017, a Clovis All-GMA, face-to-face meeting was held in San Francisco.  During the meeting, a Senior MSL from Germany gave a non-compliant presentation. As a senior-level MSL and the only Clovis GMA employee in Germany at the time, he had great responsibility for ensuring the compliant conduct of MSL duties in that country.  Dr. Shing provided feedback to the Senior MSL regarding his non-compliance, but he was resistant. Thereafter, Dr. Shing reported her concerns about the Senior MSL to her supervisor, Rolfe, who is also a member of Clovis' Compliance Committee, but Rolfe was utterly indifferent.  Later, Dr. Shing would be criticized for her leadership in attempting to ensure compliance by the Senior MSL.

22.     On April 20, 2017, Dr. Shing met with defendant Ann Bozeman, Senior Vice President, Human Resources ("HR"), at Clovis' Boulder, Colorado office.  Despite her role being limited to HR, Bozeman instructed Dr. Shing to force collaboration between Clovis' U.S. Commercial Sales team and the U.S. Medical Science Liaisons, claiming it was essential to Dr. Shing's success with the company.  Dr. Shing understood the instruction to be in violation of the company's legal and ethical obligations, as drug companies like Clovis are required to maintain a strict separation between U.S. commercial activities and U.S. medical affairs non-promotional activities.  Worse still, Bozeman's instruction was accompanied by a thinly-veiled threat of retaliation, as she boasted about her role in the firing of another employee for complaining about an alleged extra-marital affair by one of the Clovis' Vice Presidents (with whom Dr. Shing was working directly).  Bozeman gossiped to Dr. Shing about this Commercial Europe Vice President's alleged affair with a contractor in Commercial Europe, gratuitously disclosing confidential information in the process.  In fact, an extra-marital affair between the Clovis VP and a contractor working with that VP could be non-compliant because of potential kickback(s) with personal advantage (according to Section III, Clovis Code of Business Ethics), and which was likely the concern of the employee who was fired by Bozeman.  As before, Dr. Shing reported Bozeman's egregious misconduct to her supervisor, Rolfe, who again responded with indifference – oddly confessing to Dr. Shing that she had previously reprimanded that fired

1  employee for reporting the alleged extra-marital affair to her in early 2017, telling him to shut up

2  about it.

3      23.    Bozeman was previously the Vice President of Human Resources at Jeppesen

4  Sanderson, Inc., a subsidiary of the Boeing Corporation ("Boeing").  In that capacity, Bozeman

5  was accused of age and sex discrimination, and was ultimately terminated for authorizing

6  retention payments to employees in violation of Boeing policy.

7      24.    On April 25, 2017, Dr. Shing learned of problems with the STRAT-STAMPEDE

8  study, a cooperative group study by the Medical Research Council in the United Kingdom

9  ("UK"), led by Dr. Simon Chowdhury ("Chowdhury"), a UK National Health Service physician

10  and UK government official.  Planning discussions were then underway to incorporate Clovis'

11  rucaparib drug therapy into the STAMPEDE trial for certain prostate cancer patients, to be called

12  the STRAT-STAMPEDE study.

13      25.    On May 3, 2017, the company's CEO, Mahaffy, announced the STRAT-

14  STAMPEDE study to investors during an earnings call.

15      26.    On May 5, 2017, Dr. Shing sent an email to Rolfe and others, complaining that

16  the proposed STRAT-STAMPEDE study was non-compliant [emphasis in original]: "**Clovis**

17  **Oncology Global Medical Affairs <u>does not agree with IRB [Institutional Review Board]</u>**

18  **<u>submission of the STAMPEDE Study Protocol Amendment 16.03 as written (attached)</u>,**

19  **particularly without Clovis Oncology's clear understanding of the STAMPEDE study**

20  **amendment's budget implications, timelines, and the SOC [standard of care] study**

21  **treatment combinations, i.e., will there be a chemotherapy combination as part of the SOC**

22  **with rucaparib?  [¶] Clovis Oncology GMA does not have the funds available in the GMA**

23  **IIT budget to pay for the STAMPEDE Study Protocol Amendment 16.03 as written &amp; with**

24  **current information about biomarker screening.**"

25      27.    On May 17, 2017, after approximately 6 weeks of employment with Clovis,

26  Bozeman informed Dr. Shing that she would be going through a "Leader Assimilation" exercise,

27  wherein Bozeman would solicit Dr. Shing's subordinates for information criticizing her

28  leadership.  On information and belief, employees similarly situated to Dr. Shing were not

1  required to go through the "Assimilation" exercise, which was instead a pretext for retaliation

2  against Dr. Shing for complaining about non-compliance at Clovis.  Indeed, the primary criticism

3  gathered by Bozeman about Dr. Shing in the exercise was her feedback to the Senior MSL

4  regarding his non-compliant activities.

5      28.     Between May 19-22, 2017, Dr. Shing sent multiple emails stating that Clovis

6  could not commit to funding the STRAT-STAMPEDE study protocol with rucaparib until

7  additional medical and scientific information became available later in the year.

8      29.     However, on May 26, 2017, the Clovis CEO, Mahaffy, met with Chowdhury, the

9  STRAT-STAMPEDE study's chief investigator.  Chowdhury threatened to withdraw his support

10  from two separate and independent Clovis-sponsored studies, TRITON2 and TRITON3, if

11  Clovis did not commit to funding the sham STRAT-STAMPEDE study.  Alarmingly, Mahaffy

12  acceded to the demand, agreeing to millions of dollars in kickbacks for the sham STRAT-

13  STAMPEDE study – before the study design had been finalized and Clovis GMA had completed

14  its compliance assessment.

15      30.     Dr. Shing was appalled, as Mahaffy's kickback for Chowdhury's sham study was

16  non-compliant, unethical, and potentially harmful to the study patients with prostate cancer.

17  Once again, Dr. Shing reported her concerns to Rolfe (i.e., her supervisor and a member of the

18  Clovis Compliance Committee, to whom violations were to be reported), but Rolfe took no

19  action, instead telling Dr. Shing to obey Mahaffy.  When Dr. Shing later complained about

20  Mahaffy's separate kickback to the Colorado physician and potential prescriber of Clovis' drug

21  for his Dubai, United Arab Emirates, program, described above, Rolfe again responded that Dr.

22  Shing had to follow Mahaffy's lead.  In both instances, Rolfe utterly failed to exercise her

23  responsibility to ensure compliance.

24      31.     On June 16, 2017, based on Mahaffy's public communications about the sham

25  STRAT-STAMPEDE study, Credit Suisse projected >$800 million in the first 3 years of prostate

26  cancer earnings for Clovis, grossly misleading investors at that time.

27      32.     On July 6, 2017, following a related discussion with Rolfe, Mahaffy stormed into

28  Dr. Shing's office in San Francisco, interrupting an ongoing meeting, and started yelling at Dr.

Shing.  Mahaffy tried to force Dr. Shing to immediately initiate a rucaparib drug Expanded

Access Program ("EAP").  Dr. Shing calmly answered "No" and slowly stood up from her seat

to meet Mahaffy at eye level for this critical conversation, watching Mahaffy transform into a

deep red rage.  Again, Mahaffy yelled at Dr. Shing to immediately initiate a rucaparib drug EAP

in Europe.  And again, Dr. Shing calmly answered "No" and stated that there were key factors,

including patients' unmet needs, the EAP patient population, European regulatory requirements,

etc., that the rucaparib EAP Working Group's cross-functional team members were assessing for

a possible rucaparib EAP.  No amount of clear, calm, expert discussion was able to penetrate

Mahaffy's fury.  Mahaffy raged for his new rucaparib EAP with total disregard for the careful

compliance assessment being conducted by Dr. Shing and the global cross-functional team.

Mahaffy was fixated on getting his rucaparib EAP because Clovis' competitor, Tesaro, Inc., had

started a new niraparib drug EAP; so Mahaffy wanted his EAP, too.  Dr. Shing calmly stated

"No" a third time, and as she tried again to discuss that an EAP is for supporting patients' unmet

needs and that an EAP is not a sales and marketing tool, Mahaffy turned around and stormed out,

sliding shut her office door with a loud bang.  Dr. Shing was stunned for several moments, until

her junior colleague – who was still seated for their meeting – stated, "You just said 'No' to the

CEO multiple times."  Dr. Shing explained to her junior colleague that it is important for the

company to be compliant, and for the rucaparib EAP Working Group to carefully assess patients'

unmet medical needs and operational procedures for a possible rucaparib EAP.  After the

sickening interaction with Mahaffy, and after completion of a productive meeting with the junior

colleague, Dr. Shing cried privately in her office – exhausted and deeply fearful that Mahaffy

could potentially harm patients, and that she may not be able to protect patients and the

organization against Mahaffy's reckless abuse of power.

33.     On August 2, 2017, Mahaffy had another earnings call with investors, again

touting the sham STRAT-STAMPEDE study.  Mahaffy failed to disclose to investors that a UK

physician had extorted expensive funding for this sham study from Mahaffy, by threatening to

sabotage two other, independent Clovis studies, and thereby derailing Clovis' potentially

lucrative prostate cancer program.  Mahaffy also failed to disclose to investors that the sham

1  STRAT-STAMPEDE study did not yet have an agreed study design, treatment plans, or

2  timelines that could actually improve the lives of patients with newly-diagnosed, castration-

3  sensitive, high risk or metastatic prostate cancer.

4        34.    By this time, a clear pattern had emerged – Dr. Shing worked to ensure

5  compliance, reporting her concerns to Rolfe and the Compliance Committee, who took no action

6  whatsoever.  Instead, Clovis, Rolfe, and Bozeman retaliated against Dr. Shing, subjecting her to

7  unfounded and subjective criticism of her Clovis assimilation, in an obvious effort to bully Dr.

8  Shing into silence.  Thus, on August 25 and 28, 2017, Dr. Shing – who has successfully led

9  teams throughout her distinguished career in the pharmaceutical and biotechnology industry –

10  was targeted, bullied, and berated for purported "poor Clovis assimilation" in a series of surreal,

11  malicious, and multi-hour group harassment meetings led by Bozeman and endorsed by Rolfe.

12  Nonetheless, Dr. Shing maintained her composure, determined to fix the dangerous culture of

13  non-compliance at Clovis.

14        35.    Also, on August 28, 2017, Dr. Shing learned that Mahaffy had provided

15  additional kickbacks, which Mahaffy and Rolfe had hidden from her, thwarting Dr. Shing's

16  ability to ensure compliance, one of her principal responsibilities.

17        36.    On October 11, 2017, Dr. Shing presented her proposal for a Rucaparib Medical

18  Differentiation Workshop to Clovis executive leadership, including Mahaffy.  Dr. Shing's

19  Medical Differentiation Workshop proposal received support and approval by Mahaffy and

20  Clovis executive leadership.  Dr. Shing, the GMA team, Clovis cross-functional colleagues, and

21  external consultants worked together to create the important workshop to be held in December

22  2017, in preparation for FDA's approval of rucaparib maintenance treatment of recurrent ovarian

23  cancer anticipated in early 2018.

24        37.    On October 18, 2017, at a Clovis leadership meeting in Colorado, Mahaffy

25  challenged the Clovis Vice President, Compliance Officer's presentation in front of more than 20

26  Clovis senior leaders and forcefully pressured him to reduce compliance restrictions at the

27  company, again showing Mahaffy's contempt for the compliance process.  As the Compliance

28  Officer calmly addressed the CEO's tirade against compliance, Mahaffy's face turned red with

1    rage, giving Dr. Shing a sickening flashback to Mahaffy's harassment in her office on July 6,

2    2017.  This, of course, had a chilling effect on the compliance efforts of Dr. Shing and others.

3          38.    On October 19, 2017, Dr. Shing had a discussion with Neil Chandler

4    ("Chandler"), Vice President and Head of Commercial Europe, regarding non-compliant and

5    unethical behavior by his subordinates.  In a subsequent email, Dr. Shing was explicit about her

6    concerns: "Attached is Spain GM's [General Manager's] solicitation for a clinical study proposal

7    from APICES CRO [a clinical research company] (attached), without prior agreement or input

8    by GMA – There is no clinical research objective, patient population, etc. included in this

9    APICES CRO proposal.  [¶] It is not the correct role of a Europe Commercial GM to solicit a

10   CRO proposal about a clinical study, without GMA's or Clinical Development's awareness or

11   endorsement."  In addition, Dr. Shing was concerned that the Spain Commercial GM had non-

12   compliant clinical study discussions with a key Spanish physician, who was a longtime

13   collaborator with Clovis GMA and Clinical Development, and an independent expert consultant

14   for Clovis' ongoing rucaparib marketing authorization application to the European Medicines

15   Agency.  Yet again, Dr. Shing reported her concerns to Rolfe, who again did nothing.

16         39.    On November 2, 2017, Mahaffy had another earnings call with investors, as

17   before touting the sham STRAT-STAMPEDE study, without explaining that it had been funded

18   with unlawful kickback money.

19         40.    On November 7, 2017, Dr. Shing met with Chandler at meetings in Vienna,

20   Austria, again highlighting the non-compliant and unethical behavior of his subordinates.

21   Chandler responded with hostility, forcing Dr. Shing to address the matter with Rolfe and

22   Bozeman.  After professing initial support, Bozeman later harassed and bullied Dr. Shing based

23   on false complaints from Chandler.  Indeed, Bozeman simply believed the unfounded allegations

24   of Chandler, failing to conduct an investigation – a clear violation of her HR responsibilities.

25   Moreover, when Dr. Shing later forwarded emails to Bozeman from colleagues who attended the

26   meetings praising her performance, Bozeman told her to stop sending the emails.

27         41.    On November 20, 2017, Dr. Shing had a final, face-to-face meeting with Rolfe.

28   Dr. Shing again reported the non-compliant and unethical behavior by Chandler and his

1   subordinates, and Bozeman's failure to protect her from retaliation.  Rolfe agreed about

2   Chandler's misconduct but once again failed to take any action to address the matter.  Instead,

3   Rolfe gave Dr. Shing two choices: (1) resign and negotiate a severance, or (2) stay at Clovis and

4   risk more retaliation from Bozeman, who Rolfe indicated would not be leaving the company.

5   Dr. Shing asked Rolfe for her advice and was told that she should consider negotiating an exit

6   package.  During the meeting, there was no discussion of termination.

7         42.     Despite the shock of effectively being told that it was hopeless to ensure

8   compliance and her best option was to quit, Dr. Shing remained dedicated to her job.  Thus, she

9   continued preparations for the Clovis-wide Rucaparib Medical Differentiation Workshop, which

10   Dr. Shing was hosting in San Francisco on December 4 and 5, 2017.  In addition, she continued

11   to develop positive working relationships with her colleagues and subordinates.

12         43.     Finally, Dr. Shing remained dedicated to compliance, again complaining about

13   non-compliant, unethical behavior by an EU Commercial leader on November 30, 2017: "As

14   clearly communicated by the Clovis Oncology members to the [D--] Study team – It is required

15   for the [D--] Study proposal to be fully evaluated through the Clovis Oncology Global IIT

16   Review process, and a go/no go decision for possible Rucaparib participation in the [D--] Study

17   will be based on unmet medical need for patients as per the Clovis Oncology Global IIT Program

18   objective and review process."  A few hours later, Dr. Shing was forced into a retaliatory

19   departure.

20         44.     On December 2, 2017, Bozeman sent an email to the attendees of Dr. Shing's

21   Rucaparib Medical Differentiation Workshop (approximately 45 colleagues): "Team – given that

22   [Dr. Shing] has left Clovis, this meeting will be postponed to a later date.  We apologize for this

23   inconvenience and hope that those traveling to San Francisco for this meeting only have time to

24   cancel your flight and hotel."  Given that the workshop was to begin only two days later, on

25   December 4, the email was clearly defamatory, falsely implying that Dr. Shing abandoned her

26   colleagues immediately before a critical, long-planned international meeting, forcing its

27   cancellation.  In fact, Dr. Shing was still employed by Clovis and planned to conduct the

28   important Medical Differentiation Workshop on December 4 and 5, 2017.  On December 3,

1    2017, Dr. Shing went to work to prepare for the workshop but discovered she was locked out of

2    her office without notice.  Then Dr. Shing found out Bozeman lied about her having left Clovis,

3    and that Bozeman had abruptly cancelled Dr. Shing's workshop without her knowledge.

4          45.     In December 2017 and early 2018, Dr. Shing repeatedly tried to be reinstated in

5    her Senior Vice President, Global Medical Affairs position at Clovis – a position at the top of Dr.

6    Shing's biopharmaceutical career dedicated and focused on behalf of patients – but she was shut

7    out.

8          46.     Dr. Shing refused to be bullied into silence by Clovis.  Dr. Shing's job

9    performance at Clovis was exemplary, and continued to be borne out after her forced departure

10    on December 8, 2017, when: (1) the rucaparib EAP's initiation was in fact postponed until

11    rucaparib received a positive opinion from the European Medicines Agency recommending

12    conditional marketing authorization in March 2018, as was insisted by Dr. Shing against

13    Mahaffy's forceful demands for an immediate EAP in July 2017; (2) the multi-million dollar

14    kickback funding of the sham STRAT-STAMPEDE study was in fact delayed by Dr. Shing's

15    efforts initiated in May 2017, and ultimately, the sham STRAT-STAMPEDE study was

16    cancelled in June 2018; and (3) on the Clovis Q3 2018 earnings call in October 2018, Mahaffy

17    spoke of the challenges of rucaparib's ovarian cancer growth including "a perceived lack of

18    differentiation amongst the market of PARP inhibitors" – a problem that could have been

19    prevented by Dr. Shing's Rucaparib Medical Differentiation Workshop in December 2017, but it

20    was cancelled.

21                               **FIRST CAUSE OF ACTION**

22       **Whistleblower Retaliation in Violation of California Labor Code section 1102.5**

23                         **[Dr. Shing Against Clovis]**

24          47.     Plaintiff incorporates by reference and realleges each and every allegation set

25    forth above, as though fully set forth herein.

26          48.     Pursuant to California Labor Code section 1102.5(b), "[a]n employer, or any

27    person acting on behalf of the employer, shall not retaliate against an employee for disclosing

28    information . . . to a person with authority over the employee or another employee who has the

authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." Furthermore, pursuant to California Labor Code section 1102.5(c), "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

49.     Dr. Shing repeatedly made protected disclosures to both her superiors and the Clovis Compliance Committee regarding the company's violations of applicable federal and state laws and regulations, including, but not limited to, 15 U.S.C. section 77q, 15 U.S.C. section 78dd-1, 42 U.S.C. section 1320a-7b, 17 C.F.R. section 240.10b-5, and California Labor Code section 1050.  Dr. Shing also refused to participate in Clovis' unlawful activities.

50.     Dr. Shing believes and thereon alleges that her protected disclosures and refusal to participate in Clovis' unlawful activities were contributing factors in Clovis' continuing course of unlawful conduct, including retaliation, as set forth hereinabove.  Such retaliation is in violation of California Labor Code sections 1102.5(b) and (c), and has resulted in damage and injury to Dr. Shing, as alleged herein.

51.     As a proximate result of Clovis' willful, knowing, and intentional retaliation against Dr. Shing, she has sustained and continues to sustain substantial losses in earnings and other employment benefits.

52.     Furthermore, as a proximate result of Clovis' unlawful conduct, Dr. Shing has sustained and continues to sustain physical injuries, pain and suffering, extreme and severe mental anguish, and emotional distress.  Dr. Shing has also incurred and will continue to incur medical expenses for treatment and for incidental medical expenses.  Dr. Shing is thereby entitled to general and compensatory damages in amounts to be proven at trial.

53.     Clovis' unlawful conduct, as described above, was willful, despicable, knowing, and intentional; accordingly, Dr. Shing seeks an award of punitive and exemplary damages in an

amount according to proof.

**SECOND CAUSE OF ACTION**

**Wrongful Termination in Violation of Public Policy**

**[Dr. Shing Against Clovis]**

54.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

55.     The public policy of the State of California, as set forth in its Labor Code section 1102.5(b), provides that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."  Moreover, the public policy of the State, as set forth in its Labor Code section 1102.5(c), provides that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."  Labor Code section 1102.5 "reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation."  (*Hager v. County of Los Angeles* (2014) 228 Cal.App.4th 1538, 1548, quoting *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77 [internal quotations omitted].)

56.     As set forth hereinabove, Dr. Shing believes that her (1) protected disclosures regarding, *inter alia*, Clovis' violations of applicable federal and state laws and regulations, and (2) refusal to participate in such unlawful activities were contributing factors in Clovis' continuing course of unlawful conduct, including retaliation and wrongful termination.  Such misconduct is in violation of the public policy of the State of California set forth in its Labor Code sections 1102.5(b),(c), and has resulted in damage and injury to Dr. Shing, as alleged herein.

57.     As a proximate result of Clovis' willful, knowing, and intentional retaliation and discrimination against Dr. Shing, she has sustained and continues to sustain substantial losses in earnings and other employment benefits.

58.     As a direct and proximate result of Clovis' unlawful conduct, Dr. Shing has sustained and continues to sustain physical injuries, pain and suffering, extreme and severe mental anguish, and emotional distress.  Dr. Shing has also incurred and will continue to incur medical expenses for treatment and for incidental medical expenses.  Dr. Shing is thereby entitled to general and compensatory damages in amounts to be proven at trial.

59.     Clovis' conduct as described above was willful, despicable, knowing, and intentional; accordingly, Dr. Shing seeks an award of punitive and exemplary damages in an amount according to proof.

### THIRD CAUSE OF ACTION

### Defamation

### [Dr. Shing Against Clovis and Bozeman]

60.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

61.     Dr. Shing alleges, upon information and belief, that Clovis and Bozeman willfully and maliciously made false and defamatory statements about her, both internally to co-workers at Clovis and externally to third persons, as set forth hereinabove.  These statements include express and implied statements that Dr. Shing's subordinates were afraid of her, that her "leadership assimilation" into Clovis was poor, and that she abandoned her colleagues by resigning immediately prior to the Medical Differentiation Workshop, forcing its cancellation. The statements are defamatory per se, in that their defamatory meaning is readily perceived without extrinsic aid beyond intelligence and common sense.

62.     The aforementioned false and defamatory statements were made by Bozeman in her official capacity as an agent and/or employee of Clovis, for which the company may be held liable under principles of respondeat superior.  (*Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 284, citing *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 411.)

63.     The aforementioned false and defamatory statements were unprivileged.  First, the publications were motivated by Bozeman's hatred or ill will towards Dr. Shing, as evidenced by, *inter alia*, her fabrication of baseless charges, *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 391; and deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of the statements, *Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1048, quoting *Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 692.  Second, Bozeman lacked reasonable ground for belief in the truth of the publications and therefore acted in reckless disregard of Dr. Shing's rights.

64.     Dr. Shing is informed and believes that the false and defamatory statements will continue to be published by Clovis and Bozeman and will be foreseeably republished by their recipients, all to the ongoing harm and injury to Dr. Shing's business, professional, and personal reputations.  Therefore, Dr. Shing seeks redress in this action for all foreseeable republications, including her own compelled self-publication of the statements.

65.     Dr. Shing is entitled to special damages for the damage done to her property, business, trade, profession, or occupation.  In particular, Clovis' and Bozeman's statements to Dr. Shing's colleagues damaged her professional reputation and harmed her prospect of finding other employment in her chosen professions.

66.     Dr. Shing is also entitled to general damages for her loss of reputation and harassment in accordance with proof at trial.

67.     Clovis and Bozeman acted with reckless, willful, or callous disregard for Dr. Shing's rights and with malice, fraud, or oppression toward her, thereby entitling Dr. Shing to an award of punitive damages in accordance with proof at trial.

### FOURTH CAUSE OF ACTION

### Breach of Express or Implied Contract

### [Against Clovis]

68.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

///

69.     The terms and conditions of Dr. Shing's employment relationship with Clovis were governed by express and implied agreements ("contract") between the parties.  Said contract included, but was not limited to, all applicable policies and procedures of Clovis, including, but not limited to, those requiring progressive discipline, due process, and good cause for termination, along with those policies prohibiting retaliation and discrimination.

70.     In taking the adverse actions against Dr. Shing complained of herein, Clovis deliberately breached such contract of employment.

71.     As a direct, foreseeable, and proximate result of Clovis' breach of said contract, Dr. Shing has lost income and career opportunities, and has suffered other economic losses, to be determined at time of trial.  Dr. Shing has sought to mitigate such wage-related damages.

**FIFTH CAUSE OF ACTION**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**[Against Clovis]**

72.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

73.     The aforesaid employment contract contained an implied covenant of good faith and fair dealing, by which Clovis promised to give full cooperation to Dr. Shing and her performance under said contract, and to refrain from doing any act which would prevent or impede Dr. Shing's enjoyment of the fruits of the contract.  Specifically, the covenant required Clovis to fairly, honestly, and reasonably perform the terms and conditions of the contract.

74.     Dr. Shing is informed and on that basis believes that Clovis breached the aforesaid employment contract with Dr. Shing without conducting any reasonable investigation concerning their obligations under the contract, without good or sufficient cause, for reasons extraneous to the contract, and for the purpose of frustrating Dr. Shing's enjoyment of the benefits of the contract.  Accordingly, Clovis breached their implied duty of good faith and fair dealing.

///

///

75.     Furthermore, Clovis breached the aforesaid covenant with regard to Plaintiff through their conduct in:

      a.   subjecting Dr. Shing to differential standards of conduct from other employees;

      b.   terminating Dr. Shing's employment without cause, reason, or justification; and

      c.   failing to follow written personnel policies, or to apply the same personnel practices to other employees in the same manner that they were strictly applied to Dr. Shing.

76.     As a direct, foreseeable, and proximate result of Clovis' breach of the implied covenant of good faith and fair dealing, Dr. Shing has lost income and career opportunities, and has suffered other economic losses, to be determined at time of trial.  Dr. Shing has sought to mitigate such wage-related damages.

**PRAYER FOR RELIEF**

WHEREFORE, Dr. Shing prays for judgment against Clovis and Bozeman as follows:

A.     For injunctive relief and all orders necessary to ensure that Clovis establishes and enforces policies and procedures protecting its employees from unlawful retaliation and discrimination;

B.     For compensatory damages, including loss of wages, promotional opportunities, employment benefits, vacation benefits, reinstatement, medical bills, and other special and general damages according to proof but in excess of the jurisdictional threshold of this court;

C.     For mental and emotional distress damages;

D.     For an award of interest, including prejudgment interest, at the legal rate;

E.     For reasonable attorneys' fees pursuant to California Code of Civil Procedure section 1021.5 and all other applicable statutes;

F.     For punitive and exemplary damages in an amount sufficient to punish and deter Clovis' and Bozeman's outrageous conduct;

G.     For costs of suit incurred herein; and,

H.      For such other and further relief as the court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.


DATE: April 7, 2018                              GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER


                                             /s/ Robert J. Schwartz

                                             Robert J. Schwartz
                                             Attorneys for Plaintiff
                                             MONA SHING, M.D.